

RECEIVED
JAN 2 6 2006
U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BY ___ CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CLAUDE FRAZIER INDIVIDUALLY AND
ON BEHALF OF ALL OTHER
SIMILARLY SITUATED PERSONS,

VERSUS

PIONEER AMERICAS, LLC AND STATE OF
LOUISIANA THROUGH THE DEPARTMENT
OF ENVIRONMENTAL QUALITY

C.A. NO: 05-1338-JJB,SCR

SECTION: D

JUDGE: BRADY

MAGISTRATE: REIDLINGER

**PLAINTIFFS' REBUTTAL BRIEF RESPONDING TO DEFENDANTS'
MEMORANDUM TO OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND**

MAY IT PLEASE THE COURT:

I.    **THE CLASS ACTION FAIRNESS ACT DOES NOT APPLY TO THIS CASE.**

   A.   **28 USC 1332(d) bars this action from falling under the Class Action Fairness
        Act.**

   The Class Action Fairness Act ("CAFA"), 28 USC 1332(d)(5), provides: "Paragraphs (2) and

(4) shall not apply to any class action in which –

> (A) the primary defendants are States, State Officials, or the other
> governmental entities against whom the district court may be
> foreclosed from ordering relief.

The issue becomes whether the State Through the Department of Environmental Equality is a

"primary defendant." FACA was recently enacted in 2005. There is no interpretation under the Act

as to who is considered a "primary defendant." Legislative history provides: " 'primary defendants'

should include any person who has substantial exposure to significant portions of the proposed class

1

in the action, **particularly any defendant that is allegedly liable to the vast majority of the members of the proposed class (as opposed to simply a few individual class members).**" [Emphasis added] In the subject case, all members of the proposed class are asserting a claim against DEQ, not just a few members. DEQ clearly has substantial exposure considering the number of claims and the type of exposure involved.

The issue of immunity under La. R.S. 9:2798.1 must be determined as well. The immunity issue will be determined by whether DEQ had any discretion to warn the public of the release. The subject case closely parallels the case of <u>Batton v. Georgia Gulf</u>, (La. MD 5/6/03) 261 F.Supp.2d 575. Plaintiff re-emphasizes and re-urges the <u>Batton, *Id.*</u> case where The Louisiana Department of Health and Hospitals was held NOT to be immune (as discussed in Plaintiffs' Motion to Remand).

In the subject case, DEQ's non-discretionary duties are set forth in the Environmental Regulatory Code, Title 33.

> The purpose of this Chapter is to establish procedures for notifying those members of the public whom the department determines are likely to be adversely affected by a release that poses a significant risk of adverse health affects. Title 33 § 101 (A)
>
> The department **shall** issue notice of a release that poses a significant risk of adverse health effects to persons whom the department reasonably determines are likely to be adversely affected by the release. Title 33 § 109 (B)

[Emphasis added]. When there is "significant risk" there is no discretion. In regard to significant risk of adverse health effects, The Penalty Calculation Worksheet generated by DEQ in assessing the penalty to Pioneer provides as follows: "mercury gas modeling of the facility shows sufficient evidence for the potential of offsite impact in residential areas surrounding the facility." (Penalty Assessment with attached Calculation Worksheet, Attached as Exhibit "A" in globo). In addition, DEQ assessed a huge penalty ($402,742.35) against Pioneer. (Exhibit "A"). Clearly the subject case, meets the criteria set out in the Environmental Regulatory Code as a "substantial risk."

In addition, the Environmental Regulatory Code Title 33 § 109 (D) provides what is considered to be a "triggering event" for when DEQ SHALL provide notice. The subsection provides as follows:

> When the department [DEQ] becomes aware of information and determines that a release is **likely** to have off-site impacts that exceed the applicable **federal or state** health and safety standard and pose a significant risk of adverse health effects.

[Emphasis added]. The "triggering event" definition only provides that if the release "is likely" to have off-site impacts that exceed federal or state health and safety standards. It does not say that it definitely has to have an off-site impact just that it is likely. Plaintiff re-emphasizes the Penalty Calculation Sheet. DEQ's own documentation states that there is "sufficient evidence for the potential of offsite impact." (Exhibit "A"). Subsection 109 goes on to provide that DEQ **SHALL** provide notice within 30 days of the event, and it further provides the contents of such notice. When a "triggering event" occurs, DEQ does not have discretion. DEQ is not immune in the subject case.

The subject release/"triggering event" did exceed FEDERAL standards, in particular 41 CFR 61.52. Both defendants have submitted affidavits from representatives of DEQ. The Affidavits of Sisisak Patrick Pakunpanya and Bryan Johnston each refer to the Ambient Air Standard. (Attached as Exhibits B & C, respectively). The Ambient Air Standard is a generalized standard. It does not address mercury specifically, nor does it provide specific guidelines for the amount of mercury that can be emitted safely. The Code of Federal Regulations, however, does address mercury specifically and the amount that can be safely emitted.

Mr. Pakunpanya's affidavit cleverly refers only to the Ambient Air Standard. He conveniently fails to address the Code of Federal Regulation at all. The Johnston Affidavit, in paragraph three, discusses how DEQ came to the emission limit provided in the permit. Paragraph

3

three provides the permit's emission limit is lower than state and federal health and safety standards. Neither affidavit provides that Pioneer did not exceed state or federal emission standards because they did. Pioneer, by their own admission, exceeded the emission limit provided in the Code of Federal Regulation, 40 CFR 61.52. The Code of Federal Regulation, 40 CFR 61.52 (a), provides "Emissions to the atmosphere from mercury ore processing facilities and mercury cell chlor-alkali plants shall not exceed 2.3 kg **(5.1 lb) of mercury per 24-hour period**." [Emphasis added]

In Pioneer's October 18, 2004 letter to DEQ, Pioneer "conservatively estimates" that a hydrogen vent emitted between 0.1467 and 0.2206 lb/hour of mercury. (Attached as Exhibit "D") The higher part of the range given by Pioneer's conservative estimate for the vent alone exceeds the Code of Federal Regulation. Pioneer conservatively estimated that the highest amount that was emitted was 0.2206 pounds per hour. 0.2206 multiplied times 24 hours equals 5.2944 pounds, which is higher than the federal standard of 5.1 pounds per 24-hour period.

In addition to the vent discussed above, there were two boilers that emitted mercury as well. Pioneer estimates that the two boilers each emitted between 0.0795 and 0.1025 pounds per hour during the same period. (October 18, 2004 letter, Exhibit "D") The range for the two boilers combined totals: 0.159 to 0.205 pounds per hour. When the boiler emissions are added to the vent emission, the total emission ranges between: 0.1467 and 0.2206 pounds per hour. The conservative estimate for the total emissions for all three sources is: **0.3057 and 0.4256 pounds per hour (7.3368 to 10.2144 per 24-hour period)**. The maximum Pioneer could have emitted without exceeding the Code of Federal Regulation was 0.2125 per hour or 5.1 pounds per 24-hour period. Pioneer clearly exceeded the Federal Standard.

The seriousness of the subject release is reflected in Peggy Hatch's (Administrator of the Enforcement Division of DEQ) affidavit. (Attached hereto as Exhibit "E") She attests in paragraph three of her affidavit as follows:

4

> Due to the persistence of mercury in the environment, and in
> particular its tendency to accumulate in streams, rivers and lakes, the
> excess mercury emissions by Pioneer Americas LLC could potentially
> result in **detrimental effects to public health**.

[Emphasis added] (Hatch Affidavit, paragraph three, attached hereto as Exhibit "E").

DEQ did not have any discretion of telling area residents of the release. As discussed in Plaintiff's Motion to Remand, the purpose of DEQ's duty is so that the affected population can evacuate, seek appropriate medical treatment, and advise their healthcare providers of what they have been exposed to so the provider can treat their patient accordingly. As pointed out in Ms. Hatch's affidavit, mercury has a tendency to accumulate in streams, rivers, and lakes. It does not dissipate into the atmosphere as soon as it is released. The defendants' argument that DEQ has no liability because DEQ did not find out about the release until after it happened is without merit.

Further, the significance of the health risks posed to the surrounding area is reflected in the penalty assessed to Pioneer by DEQ. On December 28, 2005, assessed a $402,742.35 penalty on Pioneer. (Penalty Assessment and Calculation Worksheet, Attached hereto as Exhibit "A") If the subject release did not pose a significant health risk to the surrounding area, why was there such a large penalty?

**B.** **This Court SHALL decline jurisdiction over this case because the criteria of 28 USC 1332(d)(4) are met.**

In addition to the bar set out by 28 USC 1332(d)(5), the Court's limited jurisdiction cannot be invoked in the subject case. 28 USC 1332(d)(4) provides:

(4) A district court shall decline to exercise jurisdiction under paragraph (2) —

    (A)(i) over a class action in which--

> (I) greater than two-thirds of the members of all proposed
> plaintiff classes in the aggregate are citizens of the State in
> which the action was originally filed;

5

(II) at least 1 defendant is a defendant--

    (aa) from whom significant relief is sought by members of the plaintiff class;

    (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

    (cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

    (ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

Subsection (A)(i)(I) is easily met, and not disputed. Over two-thirds of the members of the proposed class are citizens of Louisiana (where this action has been filed).

Subsection (A)(i)(II) is where issues arise, and the defendants' argument that this court has jurisdiction fails because DEQ is a proper defendant, as discussed previously. Significant relief is sought from DEQ because their misconduct forms a significant basis for the claims asserted. DEQ failed to notify the surrounding area of something that could "potentially result in detrimental effects to public health." (Hatch Affidavit, Exhibit "E"). DEQ denied those area residents the opportunity to evacuate, and seek immediate medical treatment for mercury exposure by failing to warn them of the release. The area residents were deprived of the opportunity to seek accurate medical attention because they did not know of the release and their exposure.

Subsection (A)(i)(III) is easily met as well. The injuries sustained by the plaintiff and others similarly situated were incurred in Louisiana. The release occurred from the Pioneer plant in St.

6

Gabriel, Louisiana and the chemical disbursed into the surrounding area. The surrounding area residents were affected by simply being present in the surrounding area. They were not given the knowledge of the danger that would have allowed them to protect their health.

Both subsections (A)(i)(III)(ii) and (4)(B) are met. To the best of plaintiff's knowledge, during the three year period preceding the filing of this class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons. Lastly, more than two-thirds of the members of the proposed class in the aggregate and a primary defendant (DEQ, as discussed previously in this memorandum), are citizens of Louisiana, where this action was originally brought.[1] Under Subsection (d)(4) this court shall decline to exercise jurisdiction over this matter and Remand this matter back to State Court.

**C.   The Intention of the Class Action Fairness Act of 2005 was not meant to apply to the subject case.**

Senate reports from the enactment of CAFA clearly indicate that CAFA was intended to apply in situations where there were plaintiffs from multiple states, and to prevent State Courts from having to apply other State's laws. The Senate Report No. 109-14 from February 28, 2005, provides the following: "many state courts freely issue rulings in class action cases that have nationwide ramifications, sometimes overturning well-established laws and policies of **other jurisdictions**." [Emphasis added] (Page 4). On Page 12 of the Senate Report, the Senate goes on to give examples of how diversity jurisdiction and removal statutes are abused. Among those examples are cases that involve plaintiffs from multiple states, and State Courts being forced to apply other State's law. (See also page 24, where the report refers to "nationwide" class actions). On page 24, the Senate

---

[1]   While plaintiffs acknowledge that under Batton, *Id.* the State is not a citizen of any state. Based on the purpose and legislative history of CAFA (as discussed in Subsection C below), the State should clearly be viewed as aligned with a citizen of itself for diversity purposes.

discusses the "most egregious of such cases are those in which one state court issues nationwide rulings that actually contradict the laws of other states." (Page 24)

The Senate discusses 28 USC 1332(d)(5) by saying that the subsection is designed "to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief." (Senate report, page 42). This is precisely what will happen if this Court denies plaintiffs' Motion to Remand. DEQ will argue that this court is prohibited from granting the requested relief, and dodge legitimate claims that they are responsible.

Page 39 of the Senate report discusses Subsection (d)(4) and provides as follows: "This provision [also known as the Local Controversy Exception] is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes." The Senate gives an example of the type of case that should stay in State Court. The example given is as follows: a class action brought in Florida State Court against a Florida company regarding an alleged wrongdoing, nearly all the plaintiffs live in Florida (about 90 percent), the suit is brought against a local company, and their parent company (not local). The report goes on to say that this is precisely the type of case intended for 28 USC 1332(d)(4), and it should be kept in State Court. (Senate Report, page 41)

The subject case involves a true local focus. The release occurred in Louisiana. It affected Louisiana residents that lived near the release site. Only Louisiana Law will be applied to this case. Based on the facts of this case, there is no possibility that another State's Law will be applied, or that other State's residents will be affected. All plaintiffs are residents of Louisiana. The situation that was intended by the Act simply does not exist here.

**D.** **Since this case cannot be brought under the Class Action Fairness Act, 28 USC 1332(a) applies.**

Since the Class Action Fairness Act does not apply, the only other option for this Court to have jurisdiction is under 28 USC 1332 (a), which requires complete diversity and that all defendants join in the Removal. This case does not have either.

**II.** **PLAINTIFFS ARE NOT BRINGING A "CITIZEN" SUIT AGAINST DEQ.**

La. R.S. Art. 30:2026 is intended to govern those citizens who wish to make a claim against an entity for harm to the environment. These provisions provide for remedy to citizens to act on their own behalf against violators of the Environmental Quality Act (EQA) when DEQ does not act for them. This is reflected by the Court in Sierra Club v. Givens, 97-0959 (La. App. 1st Cir. 9/26/97) 710 So.2d 249. The Court stated "if DEQ fails in its duty to enforce the provisions of the EQA by using the enforcement mechanisms contained in §2025, the next section of the EQA, §2026, provides a means of civil penalties, injunctive relief, and damages." _Id._ at 250. The Articles were intended to allow "citizen" suits against violators to make them comply with the EQA, when DEQ fails to make them comply. The Articles do not apply to individuals making personal injury claims for damages. The application of such Articles to this case is simply misplaced.

Further emphasizing the misplacement, the Louisiana Supreme Court in Pope v. State of Louisiana, 99-2559 (La. 6/29/01) 792 So.2d 713, 719, provided as follows:

> Moreover, the district courts historically have exercised original jurisdiction in tort actions as civil matters, and were doing so when the 1974 Constitution was adopted with the broad language "all civil and criminal matters" in Section 16(A) of Article V. While this court in _In the Matter of American Waste & Pollution Control_, 588 So.2d 367 (La. 1991) arguably limited the scope of the _Moore_ decision, the statutes at issue in _American Waste_ (vesting an administrative agency

with original jurisdiction in permit and enforcement actions, subject to review by the court of appeal) are vastly different from statutes granting original jurisdiction to an administrative agency in tort actions, even those in which the government is the alleged tortfeasor.

. . . this court in *In The Matter of American Waste & Pollution Co, 588 So.2d 367 (La. 1991)* in upholding the constitutionality of a statute vesting an administrative agency with original jurisdiction in permit and enforcement actions, did not discuss "public law" rights as a basis for the decision. Inasmuch as the present tort action clearly does not involve "public law".

No where have plaintiffs alleged they are making a claim to collect for damages to the environment. Each plaintiff individually and on behalf of others similarly situated are making claims based on personal damages sustained as a result of DEQ failing to warn them of the release. Since DEQ regulates the environment as the public trustee for the people of the State, DEQ has failed as public trustee in the subject case because they have failed to protect the public. (La. Const. Art. IX § 1, see also page 8 of DEQ's Memorandum in Opposition).

As admitted by DEQ in page 8 of their Memorandum, private parties (like the plaintiffs in this case) can possess claims for damages for injuries to their person. Plaintiffs have asserted a claim against DEQ for injuries to their person not the environment. Plaintiffs have not instituted this suit against DEQ because DEQ simply failed to enforce the provisions of the Environmental Quality Act against Pioneer. The cause and extent of plaintiffs' injuries is derived from DEQ's failure to warn the public (despite their duty to do so) of the subject release. La. R.S. 30:2026 would come into effect if DEQ had done nothing to regulate Pioneer in the subject case, and the citizens wanted Pioneer to be fined and/or regulated. The case of Sierra Club v. Givens, 97-0959 (La. App. 1st Cir. 9/26/97) 710 So.2d 249, is misapplied as well. Sierra, *Id.* involved a citizen suit to enforce the provisions of the Environmental Quality Act. That is not the case here.

Plaintiffs re-emphasize the case of Batton v. Georgia Gulf, (La. MD 5/6/03) 261 F.Supp.2d 575. The plaintiffs in that case sued the Department of Health and Hospitals (DHH) due to

contaminated water. The plaintiffs in that case were not suing because the environment was damaged. They sued because of personal injuries sustained from drinking contaminated water that DHH failed to warn them about.

La. R.S. Art. 30:2026 simply does not apply to this case. Plaintiffs are not attacking the contents of DEQ's rules, regulations, or decisions (there was no discretion allowing DEQ to make a decision in this case). Plaintiffs are not seeking to regulate Pioneer themselves. Plaintiffs are seeking compensation because DEQ failed to comply with their duty to warn the public (as provided in the Environmental Regulation Code), and they sustained personal injuries as a result.

**RESPECTFULLY SUBMITTED:**

**TYLER & POSSA**
*A Professional Law Corporation*

By:_____
John L. Tyler
Louisiana Bar Roll #19193
Joseph C. Possa
Louisiana Bar Roll #21032
Stephanie M. Possa
Louisiana Bar Roll #28725
3225 Broussard Street
Baton Rouge, Louisiana 70808
Telephone (225) 343-8313
Telecopier (225) 344-8353

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has been served upon all counsel of record by hand, by facsimile, or by placing a copy in the United States mail, postage prepaid, and properly addressed to:

Mr. Bradley Myers
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P.
Post Office Box 3513
Baton Rouge LA 70821

Clifton O. Bingham
Oats & Hudson
Roumain Building, Suite 550
343 Third Street
Baton Rouge, Louisiana 70801

Baton Rouge, Louisiana, this _____ 26 _____ day of January, 2006.

_____
Stephanie M. Possa

12

STATE OF LOUISIANA
DEPARTMENT OF ENVIRONMENTAL QUALITY

OFFICE OF ENVIRONMENTAL COMPLIANCE

| | |
|---|---|
| IN THE MATTER OF | * |
| | * |
| PIONEER AMERICAS LLC | * ENFORCEMENT TRACKING NO. |
| IBERVILLE PARISH | * |
| ALT ID NO. 1280-00011 | * AE-P-05-0064 |
| | * |
| | * AGENCY INTEREST NO. |
| | * |
| PROCEEDINGS UNDER THE LOUISIANA | * 2644 |
| ENVIRONMENTAL QUALITY ACT, | * |
| La. R.S. 30:2001, ET SEQ. | * |

## PENALTY ASSESSMENT

The following **PENALTY ASSESSMENT** is issued to **PIONEER AMERICAS LLC**

**(RESPONDENT)** by the Louisiana Department of Environmental Quality (the Department),

under the authority granted by the Louisiana Environmental Quality Act (the Act), La. R.S.

30:2001, et seq., and particularly by La. R.S. 30:2025(E) and 2050.3.

## FINDINGS OF FACT

i.

The Respondent owns and/or operates a chlorine and sodium hydroxide manufacturing

plant known as the St. Gabriel Facility located at 4205 Louisiana Highway 75 in St. Gabriel,

Iberville Parish, Louisiana. The facility currently operates under Air Permit No. 1280-00011-02

issued on October 12, 1998.



## II.

On or about January 5, 2005, a file review of the Respondent's facility was performed to determine the degree of compliance with Act and Air Quality Regulations. The following violation was noted during the course of the review:

> In a letter dated October 18, 2004, the Respondent reported that the carbon media in the control device for the Hydrogen Vent Stack (Emission Point No. 2-78), was not performing as designed for an unspecified number of days. According to Air Permit No. 1280-00011-02, the Hydrogen Vent Stack (Emission Point No. 2-78) is permitted to emit 0.0014 lbs/hr (annual average) and 0.0194 lbs/hr (maximum hourly) of mercury. The Respondent estimates that the Hydrogen Vent Stack (Emission Point No. 2-78) emitted between 0.1467 lbs/hr (3.52 lbs/day) and 0.2206 lbs/hr (5.29 lbs/day) of mercury over the duration of noncompliance. Also, a portion of the same hydrogen stream is routed as fuel to two (2) boilers (Emission Point Nos. 5-78 and 6-78). Each boiler is permitted to emit 0.003 lbs/hr (annual average and maximum hourly) of mercury. The Respondent estimates that these two sources emitted between 0.0795 lbs/hr (1.91 lbs/day) and 0.1025 lbs/hr (2.46 lbs/day) of mercury throughout the period that the Respondent's facility exceeded permitted emission limits for mercury. Each day the permitted emissions limitations for mercury were exceeded, is a violation of General Condition II of Air Permit No. 1280-00011-02, LAC 33:III.501.C.4, and Sections 2057(A)(1) and 2057(A)(2) of the Act.

## III.

On January 31, 2005, a Compliance Order & Notice of Potential Penalty (CONOPP), Enforcement Tracking No. AE-CN-04-0335 was issued to the Respondent.

## IV.

On March 10, 2005 an enforcement conference was held with the Respondent and representatives of the Department. During the enforcement meeting, the Respondent provided explanations concerning the circumstances for the violations cited and described actions to be taken to correct and prevent future occurrence of the violations. Also, the Respondent submitted the report required by the Order portion of the CONOPP, analysis of stack tests performed at the

2

facility, the 2003 annual report to stockholders, and a statement of monetary benefits of noncompliance.

## V.

A civil penalty under Section 2025(E) and 2050.3 of the Act may be assessed for the violations described herein.

## VI.

Having considered the factors set forth in Section 2025(E)(3) of the Act, and in light of all facts and circumstances presently known, a civil penalty would be appropriate, equitable, and justified.

## ASSESSMENT

## VII.

A penalty in the amount of $402,742.35 is hereby assessed together with legal interest as allowed by law and all costs of bringing and prosecuting this enforcement action accruing after the date of issuance.

## THE RESPONDENT SHALL FURTHER BE ON NOTICE THAT:

## I.

The Respondent has a right to an adjudicatory hearing on a disputed issue of material fact or of law arising from this **PENALTY ASSESSMENT**. This right may be exercised by filing a written request with the Secretary no later than thirty (30) days after receipt of this **PENALTY ASSESSMENT**.

## II.

The request for an adjudicatory hearing shall specify the provisions of the **PENALTY ASSESSMENT** on which the hearing is requested and shall briefly describe the basis for the request. This request should reference the **Enforcement Tracking Number and Agency Interest Number**, which are located in the upper right-hand corner of the first page of this document and should be directed to the following:

> Department of Environmental Quality
> Office of the Secretary
> Post Office Box 4302
> Baton Rouge, Louisiana 70821-4302
> **Attn: Hearing Clerk, Legal Division**
> > **Re: Enforcement Tracking No. AE-P-05-0064**
> > **Agency Interest No. 2644**

## III.

Upon the Respondent's timely filing a request for a hearing, a hearing on the disputed issue of material fact or of law regarding this **PENALTY ASSESSMENT** may be scheduled by the Secretary of the Department. The hearing shall be governed by the Act, the Administrative Procedure Act (La. R.S. 49:950, et seq.), and the Department's Rules of Procedure. The Department may amend or supplement this **PENALTY ASSESSMENT** prior to the hearing, after providing sufficient notice and an opportunity for the preparation of a defense for the hearing.

## IV.

This **PENALTY ASSESSMENT** shall become a final enforcement action unless the request for a hearing is timely filed. Failure to timely request a hearing constitutes a waiver of the Respondent's right to a hearing on a disputed issue of material fact or of law under Section 2050.4 of the Act for the violations described herein and the assessed penalty.

4

## V.

The Respondent must make full payment of the civil penalty assessed herein no later than fifteen (15) days after the assessment becomes final. Penalties are to be made payable to the Department of Environmental Quality, and mailed to:

> Department of Environmental Quality
> Office of Management and Finance
> P. O. Box 4303
> Baton Rouge, Louisiana 70821-4303
> **Attn:  Darryl Serio, Fiscal Officer**
> > **Re:  Enforcement Tracking No.  AE-P-05-0064**
> > **Agency Interest No. 2644**

Enclose with your payment the attached Penalty Payment form.

## VI.

Upon the penalty assessed herein becoming final because of the Respondent's failure to timely file a request for a hearing, and upon the Respondent's failure to pay the civil penalty provided herein or failure to make arrangements satisfactory to the Department for such payment, this matter shall be referred to the Attorney General for collection of the penalty plus all costs associated with the collection.

## VII.

For each violation described herein, the Department reserves the right to seek compliance with its rules and regulations in any manner allowed by law and nothing herein shall be construed to preclude the right to seek such compliance.

VIII.

This **PENALTY ASSESSMENT** is effective upon receipt.

Baton Rouge, Louisiana on this 28 day of _December_, 2005.

Harold Leggett, Ph.D.
Assistant Secretary
Office of Environmental Compliance

Copies of a request for a hearing and/or
related correspondence should be sent to:

Louisiana Department of Environmental Quality
Office of Environmental Compliance
Enforcement Division
P.O. Box 4312
Baton Rouge, LA 70821-4312
Attention: David R. Simmons

# PENALTY CALCULATION WORKSHEET

**Penalty Event #1** - On or about January 5, 2005, a file review of the Respondent's facility was performed to determine the degree of compliance with the Act and Air Quality Regulations. The following violations were noted during the course of the review. According to a letter dated October 19, 2004, the Respondent received stack test results from a follow up stack test on the Hydrogen Vent Stack (Emission Point No. 2-78), performed on October 7, 2004. The results showed that the mercury content exiting the Hydrogen Vent Stack (Emission Point No. 2-78) was higher than the feed stream supplying the PuraSiv carbon beds. Once the results were confirmed, a technical team was assembled and reviewed an August 1, 2004, incident during which seal water condensate was introduced to the beds. The Respondent believes that the high moisture content contributed to the nonperformance of the carbon beds. The Respondent was issued a temporary variance for maintenance activity on October 15, 2004, to replace the carbon in the PuraSiv beds. The nonperformance of the carbon media led to an unauthorized exceedance of the Respondent's permitted limits for 75 days. According to Air Permit No. 1280-00011-02, the Hydrogen Vent Stack (Emission Point No. 2-78) is permitted to emit 0.0014 lbs/hr (average) and 0.0194 lbs/hr (maximum) of mercury. The Respondent estimates that the Hydrogen Vent Stack (Emission Point No. 2-78) emitted between 0.1467 lbs/hr (3.52 lbs/day) and 0.2206 lbs/hr (5.29 lbs/day) of mercury over the duration of noncompliance. Also, a portion of the same hydrogen stream is routed as fuel to two (2) boilers (Emission Point Nos. 5-78 and 6-78). Each boiler is permitted to emit 0.003 lbs/hr (average and maximum) of mercury. The Respondent estimates that these two sources emitted between 0.0795 lbs/hr (1.91 lbs/day) and 0.1025 lbs/hr (2.46 lbs/day) of mercury for the same time period. The Respondent's facility is subject to 40 CFR 61 Subpart E-National Emission Standards for Mercury. The emission standard for mercury cell chlor-alkali plants is 5.1 pounds of mercury per 24-hour period. Each day the permitted emissions limitations for mercury were exceeded is a violation of General Condition II of Air Permit No. 1280-00011-02, LAC 33:III.501.C.4, and Sections 2057(A)(1) and 2057(A)(2) of the Act.

### Violation Specific Factors

Degree of Risk/Impact to Human Health or Property:    <u>Moderate</u>

Justification:    Exceeding the permitted limits for mercury emissions has the potential for measurable detrimental impact on the environment and public under certain conditions. Mercury is a persistent, toxic pollutant that exists in many forms and biomagnifies in the environment. Based on the range of potential mercury emissions reported by the Respondent for the period encompassing August 1, 2004, to October 15, 2004, mercury gas modeling of the facility shows sufficient evidence for the potential of offsite impact in residential areas surrounding the facility.

Nature and Gravity of the Violation:          Moderate

Justification: The Respondent deviated from emission limits set forth in Air Permit No. 1280-00011-02. Due to the failure of the carbon media in the control device, the Respondent's facility exceeded the permitted limits for mercury for the Hydrogen Vent Stack (Emission Point No. 2-78), and two (2) boilers (Emission Point Nos. 5-78 and 6-78), for the duration of noncompliance.

## Violator Specific Factors

Adjustment Factors Per Event – the upward or downward percentage adjustment for each violator-specific factor shall be no more than 100 percent of the difference between the minimum and maximum penalty amount for the chosen matrix cell. The total upward or downward percentage adjustment is also limited to 100 percent.

1. The history of previous violations or repeated noncompliance.
   Adjustment = 5 %
   Justification: The Respondent has a prior history of noncompliance with the Louisiana Environmental Quality Regulations. (See attachment 1)

2. The gross revenues generated by the Respondent.
   Adjustment = 0%
   Justification: In the 2003 Annual Report to Stockholders received by the Department on March 10, 2005, the Respondent stated that its gross revenues for 2003 were $378,675,000. A review of the Respondent's gross revenue shows that Respondent exhibited sufficient gross revenues to provide funding for environmental compliance.

3. The degree of culpability, recalcitrance, defiance, or indifference to regulations or orders.
   Adjustment = 10%
   Justification: The Respondent is fully culpable for the emissions of mercury to the atmosphere in excess of permitted emissions limits for the Hydrogen Vent Stack (Emission Point No. 2-78), and two (2) boilers (Emission Point Nos. 5-78 and 6-78). Thus, the Respondent's facility had emission rates higher than emission limits set forth in Air Permit No. 1280-00011-02. The Respondent has exhibited no recalcitrance, defiance, or indifference.

4. Whether the person charged has failed to mitigate or to make a reasonable attempt to mitigate the damages caused by the noncompliance or violation.
   Adjustment = -5%
   Justification: In a letter dated October 19, 2004, the Respondent reported that based on daily monitoring in the cell house, the Respondent believes that there was no impact to the environment or to public safety during the excursions. The Respondent submitted an

application for a temporary variance, dated October 15, 2004, and a second variance, dated November 15, 2004, for the replacement of the carbon media in the control device. The facility operated at reduced rates and did not burn hydrogen in the boilers at that time. To prevent a recurrence in the future, the Respondent intends to install a third carbon bed for the hydrogen process stream downstream later this year for redundancy at a project cost of approximately $300,000.

5. Whether the noncompliance or violation and the surrounding circumstances were immediately reported to the Department, and whether the violation or noncompliance was concealed or there was an attempt to conceal by the person charged.
Adjustment = 0%
Justification: In September of 2004, the Respondent received the test results from the stack test on the Hydrogen Vent Stack (Emission Point No. 2-78). The results were believed to be erroneous at the time because the exit hydrogen stack results were higher than the feed stream supplying the carbon beds. The Respondent performed subsequent stack testing on October 7, 2004, and received the analysis as well as confirmation of the results from the testing company on October 13, 2004. The Respondent made a verbal notification to the Department on October 13, 2004. The Respondent submitted a letter dated October 18, 2004, notifying the Department of the mercury exceedance in accordance with General Condition XI of Air Permit No.1280-00011-02. The Respondent submitted an Unauthorized Discharge Notification Report to the Department dated October 19, 2004. There appeared to be no attempt by the Respondent to conceal the violation.

Total Percentage for Violator Specific Adjustment Factors: **10%**

| | |
|---|---|
| Penalty Range for the Penalty Event (Using the Violation Specific Factors and the Penalty Matrix) | Minimum (A) $5,000 Maximum (C) $8,000 |
| Sum of the Percentages for the Penalty Event (using the Violator Specific Factors) | Sum of %s (B) **10%** |
| Formula(s) to obtain a penalty amount for each Penalty event | $P = A + (B \times [C-A])$ $P = 2(A + [B \times (C-A)])^*$ |

$P = \$5,000 + (10\% \times [\$8,000-\$5,000]) = \$5,300$
*Note – the statutory maximum is double in circumstances where the penalty event constitutes a violation of a previous enforcement action as stated in R.S. 30:2025 (E) (2).

Penalty Amount for Penalty Event = $5,300 x 75 (one penalty event for each day of noncomplying emissions) = $397,500

## MONETARY BENEFIT OF NONCOMPLIANCE
LAC 33:I.705.G

The Department shall consider the monetary benefits realized through noncompliance. Any monetary benefits calculated may be added to the penalty subtotal. However, the amount calculated may not cause the penalty subtotal to exceed the maximum penalty amount allowed by law. A cash penalty should be collected unless it has been demonstrated and documented that the violator cannot pay the cash penalty.

Benefit of Noncompliance = $2,928.08

Justification:   In a letter dated May 31, 2005, the Respondent estimated that the benefit of noncompliance would be the potential interest accrued on the total cost of the carbon replacement project between August 1, 2004 and October 15, 2004. The cost of the carbon replacement project was approximately $300,000.

## COMPUTATION OF RESPONSE COST
LAC 33:I.705.H

*Response Costs*—the costs to the state of any response action made necessary by a penalty event that are not voluntarily paid by the violator. These costs shall include, but are not limited to, the costs of surveillance staff activities including cleanup costs and the costs of bringing and prosecuting an enforcement action, such as staff time, equipment use, hearing records, and expert assistance. (See LAC 33:I:703.A)

The following is a breakdown of response costs for this Penalty Assessment.

| Personnel | Hours | Rate | Direct Cost | Federal Rate | Indirect Cost | Subtotal |
|---|---|---|---|---|---|---|
| Enforcement Writer | 15 | $12.65 | $189.75 | 79.57% | $150.98 | $340.73 |
| Enforcement Writer | 5 | $14.08 | $70.40 | 77.50% | $54.56 | $124.96 |
| Enforcement Supervisor | 1 | $29.83 | $29.83 | 79.57% | $23.74 | $53.57 |
| Enforcement Analyst | 1 | $17.60 | $17.60 | 77.50% | $13.64 | $31.24 |
| Enforcement Manager | 2.5 | $31.54 | $78.85 | 79.57% | $62.74 | $141.59 |
| Administrator | 5.5 | $40.86 | $224.73 | 77.50% | $174.17 | $398.90 |
| Administrative Analyst | 0.5 | $17.96 | $8.98 | 79.57% | $7.15 | $16.13 |
| Environmental Scientist Sr. | 9 | $34.01 | $306.09 | 77.50% | $237.22 | $543.31 |
| Environmental Scientist Sr. | 1.5 | $27.37 | $41.06 | 79.57% | $32.67 | $73.72 |
| Enforcement Manager | 4 | $26.31 | $105.24 | 77.50% | $81.56 | $186.80 |
| Enforcement Attorney | 5.5 | $30.34 | $166.87 | 77.50% | $129.32 | $296.19 |
| Surveillance Scientist Sr. | 2 | $29.83 | $59.66 | 79.57% | $47.47 | $107.13 |
| | | | | | Total | $2,314.27 |

Approved Federal Rate Effective July 1, 2004-June 30, 2005: 79.57%
Approved Federal Rate Effective July 1, 2005-June 30, 2006: 77.50%

Note: Approved Federal Rate for the corresponding period when costs were incurred is used.

# FINAL PENALTY CALCULATION

The values for each penalty amount are added to determine a **Penalty Subtotal** ($P_s$).

*$P_s$ = $ 397,500

Benefit of Noncompliance = $2,928.08

If **Monetary Benefit of Noncompliance** is added:

$$P_s = (P_1 + B_1) + (P_2 + B_2) + (P_3 + B_3)$$

$$P_s = \$397,500 + \$2,928.08$$

$$P_s = \$400,428.08$$

Response Costs ($R_c$) are then added to the penalty subtotal ($P_s$) to determine the total penalty amount ($P_t$).

$$R_c = \underline{\mathbf{\$2,314.27}}$$

**Penalty Total = Penalty Subtotal + Response Costs**

$$(P_t) = P_s + R_c$$

$P_t$ = $400,428.08 + $2,314.27

# Penalty Total = $402,742.35

* The initial Compliance Order and Notice of Potential Penalty (CONOPP) Enforcement Tracking No. AE-CN-04-0335, cited two (2) permit limit exceedances; one for the Hydrogen Vent Stack (Emission Point No. 2-78) and the other for the two (2) boilers (Emission Point Nos. 5-78 and 6-78). Since the emissions from the Hydrogen Vent Stack and two (2) boilers were controlled by the same PuraSiv carbon beds, the violation was assessed as one (1) violation per day.

# Attachment 1

| INCIDENT PARISH | AI NO. | ENF. NO. | MASTER AI NAME | RESPONSIBLE ENTITY NAME | ACTION TYPE | DATE ISSUED | STATUS | PENALTY AMOUNT | MEDIA |
|---|---|---|---|---|---|---|---|---|---|
| Iberville | 2644 | GW090007 | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | AO | 3-Jul-90 | Action Issued | | Grwater |
| Iberville | 2644 | HEC30180 | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | CO | 24-Sep-80 | Action Issued | | Haz Waste |
| Iberville | 2644 | HEC900588 | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | CO | 15-Apr-81 | Action Issued | | Haz Waste |
| Iberville | 2644 | HEP910260 | Pioneer Americas LLC - Co. (See: HEP910260A) | | PA | 18-Jun-91 | Action Issued | | Haz Waste |
| Iberville | 2644 | HEN910558 | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | NOV | 16-Jan-92 | Action Issued | | Haz Waste |
| Iberville | 2644 | HECO900588A | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | ACO | 18-Mar-92 | Action Issued | | Haz Waste |
| Iberville | 2644 | HEP910260A | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | APA | 18-Mar-92 | Action Issued | $3,000.00 | Haz Waste |
| Iberville | 2644 | HAN940507 | Pioneer Americas LLC - Pioneer Chlor-Alkai Co. | | NOV | 8-Dec-85 | Action Issued | | Haz Waste |
| Iberville | 2644 | HECV90464 | Pioneer Americas LLC - Inc | Pioneer Americas Inc | NOCV | 24-Feb-00 | Action Issued | | Haz Waste |
| Iberville | 2644 | RMPEC010016 | Pioneer Americas LLC - Chemical Div St Gabriel Installation | Pioneer Americas Inc Industrial | CO | 17-Dec-01 | Action Issued | | Air |
| Iberville | 2644 | MMCN020002 | St Gabriel Facility Pioneer Americas LLC - LLC | Pioneer Americas | CONOPP | 15-Jul-02 | Action Issued | | Multimedia |
| Iberville | 2644 | MMCN020002A | St Gabriel Facility Pioneer Americas LLC - Inc | Pioneer Americas | ACO.NOPP | 11-Apr-03 | Action Issued | | Multimedia |
| Iberville | 2644 | WEPP030562 | St Gabriel Facility Pioneer Americas LLC - Inc | Pioneer Americas | PA | 13-Oct-03 | Action Issued | $52,773.98 | Water |
| Iberville | 2644 | AEC030419 | St Gabriel Facility Pioneer Americas LLC - LLC | Pioneer Americas | CO | 22-Dec-03 | Closed | | Air |
| Iberville | 2644 | AECN040335 | St Gabriel Facility Pioneer Americas LLC - LLC | Pioneer Americas | CONOPP | 31-Jan-05 | Action Issued | | Air |

| INCIDENT PARISH | AI NO. | ENF. NO. | MASTER AI NAME | RESPONSIBLE ENTITY NAME | ACTION TYPE | DATE ISSUED | STATUS | PENALTY AMOUNT | MEDIA |
|---|---|---|---|---|---|---|---|---|---|
| Iberville | 2644 | HECN050014 | Pioneer Americas LLC - St. Gabriel Facility | Pioneer Americas LLC | CONOPP | 3-May-05 | Action Issued | | Haz Waste |

Legend:
PA - Penalty Assessment
CO - Compliance Order
NOV - Notice of Violation
APA - Amended Penalty Assessment
AO - Administrative Order
NOCV - Notice of Corrected Violation
ACO - Amended Compliance Order
CONOPP - Compliance Order & Notice of Potential Penalty

Prepared: December 22, 2005

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLAUDE FRAZIER AND ALL OTHER PERSONS SIMILARLY SITUATED | CIVIL ACTION NO.: 05-1338-JJB-SCR |
| VERSUS | SECTION: D |
| PIONEER AMERICAS, LLC AND STATE OF LOUISIANA THROUGH THE DEPARTMENT OF ENVIRONMENTAL QUALITY (DEQ) | JUDGE BRADY |
| | MAGISTRATE REIDLINGER |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT

BEFORE ME, the undersigned Notary, personally came and appeared:

### SIRISAK PATRICK PAKUNPANYA

who upon being duly sworn, deposed and said:

1. My name is Sirisak Patrick Pakunpanya, and I am over eighteen years of age and qualified to testify to the following from my own personal knowledge.

2. I am employed by the Louisiana Department of Environmental Quality (DEQ) as an Air Quality MODELER COORDINATER and have held that position since November 1991 pior to that date, I was a Project Engineer with DHHR , a position I had held since 1981 ; I have been employed at DEQ since 1981 .

3. A violation of the Pioneer Americas, LLC permit for mercury emissions does not necessarily mean that the surrounding residents will be exposed to mercury levels in the air which exceed State or Federal health and safety standards.

4. A DEQ analysis of the Pioneer Americas, LLC mercury emissions from August 1, 2004 to October 13, 2004 concluded that the ambient air mercury level in a portion of the surrounding neighborhood reached 0.5 micrograms per cubic meter. DEQ determined the applicable health or safety standard to be 1.19 micrograms per cubic meter based upon Class II, Suspected Human Carcinogens and Known or Suspected Human Reproductive Toxins

5. A true and correct copy of the plume map generated by the DEQ air modeling is attached hereto as Attachment a.



**EXHIBIT**

B

6.    And further Affiant saith not.

SIRISAK PATRICK PAKUNPANYA

SWORN TO AND SUBSCRIBED, before me, Notary, this 10th day of January, 2006.

Randall S. B

NOTARY PUBLIC

Printed name: Randall S. Beard

Notary/Bar No.: 27771

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

CLAUDE FRAZIER AND ALL OTHER    CIVIL ACTION NO.: 05-1338-JJB-SCR
PERSONS SIMILARLY SITUATED

VERSUS                           SECTION: D

PIONEER AMERICAS, LLC AND        JUDGE BRADY
STATE OF LOUISIANA THROUGH
THE DEPARTMENT OF                MAGISTRATE REIDLINGER
ENVIRONMENTAL QUALITY (DEQ)
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT

BEFORE ME, the undersigned Notary, personally came and appeared:

### BRYAN JOHNSTON

who upon being duly sworn, deposed and said:

1.  My name is Bryan Johnston, and I am over eighteen years of age and qualified to testify to
    the following from my own personal knowledge.

2.  I am employed by the Louisiana Department of Environmental Quality (DEQ) as an
    Environmental Scientist Senior and have held that position since May 30, 2005; prior to that
    date, I was an Environmental Scientist Supervisor, a position I had held since July 15, 2002; I
    have been employed at DEQ since May 3, 1997.

3.  The mercury emission limits set in the permit issued to the Pioneer Americas, LLC plant in
    St. Gabriel, Louisiana are based on the levels which are achievable with the process
    technology currently employed by Pioneer Americas, LLC as demonstrated by stack testing
    conducted at the facility; they are lower than the levels needed to keep ambient air levels
    within State and Federal health and safety standards, and lower than the mercury standard
    established by 40 CFR 61 Subpart E – National Emission Standard for Mercury.

4.  A violation of the Pioneer Americas, LLC permit for mercury emissions does not necessarily
    mean that the surrounding residents will be exposed to mercury levels in the air which
    exceed State or Federal health and safety standards.

5.  True and correct copies of the following documents from DEQ's file are attached to this
    Affidavit:


EXHIBIT
C

      a.     Pioneer Americas, LLC air permit;

      b.     Temporary Variance request dated October 15, 2004, and DEQ response;

      c.     Temporary Variance request dated November 15, 2004, and DEQ response;

6.     And further Affiant saith not.

 

 

*Bryan D. Johnston*

BRYAN JOHNSTON

SWORN TO AND SUBSCRIBED, before me, Notary, this _10th_ day of January, 2006.

 

 

*Robert D. Beard*

NOTARY PUBLIC

Printed name: _Robert S. Beard_

Notary/Bar No.: _27221_

# PIONEER.

4205 Highway 75
P.O. Box 23
St. Gabriel, Louisiana 70776

Telephone (225) 642-1800
Fax: (225) 642-1882

2644

October 18, 2004

S04- 3991
T74307
Mani /CRO

CERTIFIED MAIL RECEIPT
7003 2260 0004 8028 0756

Mr. Chris Roberie
Surveillance Division
Louisiana Department of Environmental Quality
P. O. Box 4312
Baton Rouge, LA 70821-4312

Re: *Pioneer Americas LLC – St. Gabriel, Louisiana (Iberville Parish)*
**General Condition XI – Written Notification**
Air Permit No. 1280-00011-02
Agency Interest No. 2644
Activity No.: PER1280-00011-02

Dear Mr. Roberie:

This letter is being submitted to satisfy the written notification requirements of General Condition XI of the above-referenced air permit. General Condition XI of this permit requires that a written report be submitted within five days of noncompliance of emission limitations specified therein. As explained below, Pioneer Americas LLC ("Pioneer") recently conducted an engineering analysis that indicates that the facility may have exceeded its mercury emissions limit from its hydrogen processing equipment. Upon confirmation of these analysis on October 13, 2004 Pioneer immediately took actions to reduce production rates in order to maintain compliance with Part 61 of the Mercury NESHAP Standard. Pioneer sought and received a variance from the LDEQ Permits Division on October 15, 2004 to replace the carbon media.

Pioneer owns and operates a chlor-alkali facility in St. Gabriel, Louisiana. The St. Gabriel facility operates pursuant to Air Permit No. 1280-00011-02, issued by the Louisiana Department of Environmental Quality ("LDEQ") on October 12, 1998. A permit application for a Part 70 Operating Permit was

RECEIVED

OCT 2 1 2004

DEQ
Single Point of Contact

Pioneer Americas LLC

EXHIBIT
D

submitted to the LDEQ on December 29, 2003 in accordance with LAC 33:III.507. The LDEQ has not yet issued a Part 70 permit to this facility.

While conducting a preliminary engineering analysis for future design considerations with compliance with the Mercury MACT (40 CFR Part 63 Subpart IIIII), Pioneer discovered that the carbon media in the control device for its hydrogen processing equipment (Emission Point No. 2-78) was not performing as designed. The hydrogen processing equipment is authorized to emit 0.0014 lbs/hr of Hg (annual average) and 0.0194 lbs/hr (maximum hourly). Pioneer conservatively estimates that the hydrogen processing equipment vent emitted between 0.1467 and 0.2206 lb/hr of mercury for multiple days.

In addition, a portion of this same vent stream is routed as fuel to the two boilers. Pioneer estimates these two sources emitted between 0.0795 and 0.1025 lb/hr for the same period. Each boiler is authorized to emit 0.003 lb/hour of mercury.

Although the specific cause is still being investigated, Pioneer reviewed historical performance data and believes that high moisture contributed to the non-performance of the carbon beds. The moisture could have been introduced when seal water condensate was carried over into the beds on or around August 1, 2004.

To prevent this situation from occurring in the future, Pioneer will ensure that its control device is properly maintained and operated. This incident investigation will continue to identify and verify any other potential causes for this incident. Presently Pioneer is considering installing redundant high level devices on the seal water condensate tank to prevent potential overflows and additional internal analysis on the hydrogen stream to improve monitoring of the process.

Based on daily cell house industrial hygiene monitoring rates for mercury in air and employee biological exposure results, there was no impact to the environment or to public safety during this excursion. Pioneer intends to retest the hydrogen processing equipment after the carbon media is replaced to ensure that all emission limits are satisfied.

If you have any questions or need additional information concerning this report, please call Regina Wilson, Environmental, Health & Safety Manager, at (225) 642-1863.

Sincerely,

David A. Gasper
Plant Manager

cc:     Regina Wilson, Pioneer Americas LLC – St. Gabriel
        Sam Chamberlain, Pioneer Americas LLC – Houston
        Kent Stephenson, Pioneer Americas LLC – Houston
        Kyle Beall, Kean, Miller – Baton Rouge

**PIONEER**

4205 Highway 75
P.O. Box 23
St. Gabriel, Louisiana 70776



7003 2260 0004 8028 075b

$SPOC$

MR. CHRIS ROBERIE
SURVEILLANCE DIVISION
LA DEPT OF ENVIRONMENTAL QUALITY
P.O. BOX 4312
BATON ROUGE, LA 70821-4312

70&21+4312 37

SAINT GABRIEL, LA
OCT 19 '04
6790097
U.S.POSTAGE
$4.42

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

CLAUDE FRAZIER AND ALL OTHER
PERSONS SIMILARLY SITUATED

CIVIL ACTION NO.: 05-1338-JJB-SCR

VERSUS

SECTION: D

PIONEER AMERICAS, LLC AND
STATE OF LOUISIANA THROUGH
THE DEPARTMENT OF
ENVIRONMENTAL QUALITY (DEQ)

JUDGE BRADY

MAGISTRATE REIDLINGER

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT

BEFORE ME, the undersigned Notary, personally came and appeared:

## PEGGY HATCH

who upon being duly sworn, deposed and said:

1.  My name is Peggy Hatch, and I am over eighteen years of age and qualified to testify to the following from my own personal knowledge.

2.  I am employed by the Louisiana Department of Environmental Quality (DEQ) as an Administrator of the Enforcement Division and have held that position since September 1st, 2002. I have been employed at DEQ since 1990.

3.  Although DEQ did not find that the most appropriate ambient air standard had been exceeded for the surrounding neighborhood by the Pioneer Americas, LLC emissions, such emissions present other potential consequences. Due to the persistence of mercury in the environment, and in particular its tendency to accumulate in streams, rivers and lakes, the excess mercury emissions by Pioneer Americas, LLC could potentially result in detrimental effects to public health.

4.  On December 28, 2005, DEQ issued a Penalty Assessment in the amount of $402, 742.35 to Pioneer America, LLC for this violation .

5.  True and correct copies of the following documents from DEQ's file are attached to this



EXHIBIT
E
tabbies

Affidavit:
a.     October 19, 2004 Notification Letter from Pioneer Americas, LLC;
b.     Compliance Order and Notice of Potential Penalty.

6.     And further Affiant saith not.

_____
PEGGY NATCH

SWORN TO AND SUBSCRIBED, before me, Notary, this 10th day of January, 2006.


_____
NOTARY PUBLIC
Printed name: _Randall S. Beard_
Notary/Bar No.: _2 2 2 2 1_